Eunice SAMUELS, et al., Appellants
Lorraine Warren, et al.

v.

**DISTRICT OF COLUMBIA, et al.**

No. 84–5365.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 19, 1985.
Decided Aug. 6, 1985.

Joel Polin, Washington, D.C., for appellants.

Edward E. Schwab, Asst. Corp. Counsel, Washington, D.C., for the District of Columbia, with whom John H. Suda, Principal Deputy Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for appellees.

Before WALD, EDWARDS and FRIEDMAN,[*] Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This appeal concerns the ability of tenants of federally-funded public housing to enforce certain federal housing law provisions against local public housing officials. The plaintiffs, four tenants of public housing units operated by the District of Columbia, allege that the District and its public housing officials have systematically failed to provide public housing tenants with the administrative grievance procedures mandated by the United States Housing Act of 1937, ch. 896, § 8, 50 Stat. 891 (codified as amended at 42 U.S.C. §§ 1437 *et seq.*), and its accompanying regulations. Their failure to do so, the plaintiffs argue, independently violates the due process clause of the fifth amendment, the Act, federal housing regulations, and the District's annual funding contract with the Department of Housing and Urban Development (HUD).

The plaintiffs seek declaratory and injunctive relief directing the District's public housing officials to implement administrative grievance procedures for tenant complaints concerning the District's failure to maintain dwelling units in accordance with their leases.

The district court dismissed the complaint for failure to state a claim upon which relief can be granted, concluding that the District's alleged violation of the Act and HUD regulations could not be redressed in a suit by tenants against local housing officials. We conclude that the plaintiffs state a valid claim for relief under 42 U.S.C. § 1983, and we therefore reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

## I. The Background

### A. *The Regulation of Federally-Funded Public Housing*

■ The Act, which is designed to provide "decent, safe and sanitary dwellings within the financial reach of families of low income," 42 U.S.C. § 1437, authorizes HUD to provide grants, low interest loans and tax exemptions to local public housing agencies (PHAs) for both the construction and operation of low-income housing. *See id.* §§ 1437b–1437i. The federal subsidies permit PHAs to charge below market rent to eligible low income tenants; the cost of housing constructed and operated under the Act is financed through rental payments and federal funding. *See id.* §§ 1437c(a), 1437g; *see also* A. LaFrance et al., Law of the Poor § 202 (1973) (describing the operation of the Act). While local PHAs administer the public housing projects financed under the Act, they are subject to extensive federal regulation. In particular, PHAs are required to operate public housing in compliance with provisions of the Act strictly regulating rent calculation, *see* 42 U.S.C. § 1437a, lease

---

[*] Of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a).

provisions, *see id.* § 1437d(*l*)(1), eviction procedures, *see id.* § 1437d(*l*)(3), tenant selection, *see id.* §§ 1437d(c)(4)(A), (c)(3)(i) and administrative grievance procedures, *see id.* § 1437d(k). *See also id.* § 1437d(c)(4) (providing that annual federal funding contracts shall require PHAs to comply with further HUD regulations concerning the operation of public housing projects).

At issue in this case is the specific section of the Act which provides that HUD "shall by regulation require each public housing agency receiving assistance [under the Act] to establish and maintain an administrative grievance procedure" to resolve tenant-management disputes. 42 U.S.C. § 1437d(k). HUD's regulations, in turn, provide that an administrative grievance procedure must be made available to a public housing tenant

> [i]f the tenant disputes within a reasonable time any PHA action or failure to act involving the tenant's lease with the PHA or PHA regulations which adversely affect the tenant's rights, duties, welfare or status.

24 C.F.R. § 966.50 (1984); *see also id.* § 966.53(a). The grievance procedure mandated by these regulations includes an informal settlement conference, *see id.* § 966.54, and, failing settlement, a relatively formal proceeding before an impartial hearing officer with rights to notice, limited discovery, representation by counsel, and an administrative appeal, *see id.* §§ 966.55–966.58.

The history of this grievance procedure provision and its accompanying regulations dates back to 1971 when HUD issued a series of public housing circulars requiring PHAs to recognize certain minimum tenant rights and to provide an administrative grievance forum for tenant complaints concerning adverse PHA action. *See* Circulars RHM 7465.8 and RHM 7465.9 (Feb. 22, 1971), Statutory Addendum ("S.A.") at 10, 21. In particular, Circular 8 required PHAs to include in all leases a promise to maintain public housing units in conformity with applicable local housing codes and federal regulations, *see* Circular RHM 7465.8

at 4, S.A. at 18, and Circular 9 required PHAs to establish and implement an administrative grievance procedure to resolve tenant-management disputes concerning, among other things, any PHA action or failure to act in accordance with lease requirements which adversely affects a tenant's rights, duties, welfare or status, *see* Circular RHM 7465.9 at 2, S.A. at 22.

■ At that time, HUD concluded that: [M]any of the problems faced by management and tenants in low-rent public housing have resulted in friction and strain in tenant-management relations and in litigation, costly to both management and tenants; much of which might have been avoided had some kind of procedure been available for grievances to be aired before an impartial individual or panel. . . . [The] establishment of a grievance procedure by every local housing authority, embodying certain standards and criteria, [will] improve management-tenant relationships and promote [an] improved housing environment to the advantage of the low-rent public housing program thus implementing the national housing policy as expressed by Congress.

*Id.* at 1, S.A. at 21. As several courts have noted, HUD's grievance procedure regulations were thus designed to avoid costly and divisive public housing litigation by channeling tenant-management disputes into a decentralized, informal, and relatively non-adversarial administrative process. *See, e.g., Brown v. Housing Auth.*, 471 F.2d 63, 66–67 (7th Cir.1972); *Glover v. Housing Auth.*, 444 F.2d 158, 161–62 (5th Cir.1971).

■ In 1972, Circulars 8 and 9 were specifically upheld over a challenge that HUD had exceeded its statutory authority. *See Omaha Housing Auth. v. United States Housing Auth.*, 468 F.2d 1 (8th Cir.1972), *cert. denied*, 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973). In 1975, after a complete reevaluation of the costs and benefits of the administrative grievance procedure requirement, HUD readopted and published these regulations in the Code of Federal

Regulations. *See* 39 Fed.Reg. 39,287 (1974) (proposed rules); 40 Fed.Reg. 33,402 (1975) (final rules) (current version codified at 24 C.F.R. Pt. 966 (1984)). The final regulations unequivocally require each PHA to establish and implement a grievance process that provides tenants a hearing if they dispute any PHA action or failure to act concerning lease provisions, local regulations or federal regulations. *See* 24 C.F.R. §§ 966.50, 966.51(a), 966.53(a) (1984).

In 1982, the current administration proposed a far-ranging revision of all federal regulations governing the responsibilities of local PHAs under the Act. *See* 47 Fed. Reg. 55,689 (1982). In particular, the 1982 rulemaking proposed to limit the grievance procedure requirement to disputes concerning rent calculation and tenant selection and to eliminate any federal requirement that PHAs provide an administrative forum for tenant complaints concerning PHA lease obligations. *See id.* at 55,692 ("Under the proposed rule, the PHA would not be required to make available an administrative hearing procedure for miscellaneous disputes between the PHA and its tenants arising in day-to-day operation of the housing project.").

In response to this proposal, Congress specifically amended the Act to require PHAs to establish and maintain an administrative grievance procedure for the resolution of all tenant disputes concerning adverse PHA action. The full statutory language reads as follows:

> The Secretary shall by regulation require each public housing agency receiving assistance under this chapter to establish and implement an administrative grievance procedure under which tenants will—
>
> (1) be advised of the specific grounds of any proposed adverse public housing agency action;
>
> (2) have an opportunity for a hearing before an impartial party upon timely request within any period applicable under subsection (*l*) of this section;

> (3) have an opportunity to examine any documents or records or regulations related to the proposed action;
>
> (4) be entitled to be represented by another person of his choice at any hearing;
>
> (5) be entitled to ask questions of witnesses and have others make statements on his behalf; and
>
> (6) be entitled to receive a written decision by the public housing agency on the proposed action.

An agency may exclude from its procedure any grievance concerning an eviction or termination of tenancy in any jurisdiction which requires that, prior to eviction, a tenant be given a hearing in court which the Secretary determines provides the basic elements of due process.

Housing and Urban-Rural Recovery Act of 1983, § 204, Pub.L. No. 98–181, 97 Stat. 1153, 1178 (codified at 42 U.S.C. § 1437d(k)). Congress contemplated that HUD would implement this provision by retaining its present grievance procedure regulations. *See* H.R.Rep. No. 123, 98th Cong., 1st Sess. 35–36 (1983) [hereinafter *House Report*].

Shortly after HUD adopted the current regulations in 1975, the District enacted a detailed administrative grievance process for public housing tenants designed to satisfy federal requirements. *See* 23 D.C. Reg. 254, 264–73 (July 9, 1976) (proposing regulations); National Capital Housing Authority Rules and Regulations § 2.12 (1978) (final regulations) [hereinafter *NCHA Rules*]. Tracking the structure and language of the federal regulations, the local guidelines require the National Capital Housing Authority (NCHA), which administers the District's public housing projects, to provide administrative grievance machinery for tenant complaints concerning "any action or failure to act by the NCHA which may adversely affect [the tenant's] rights, duties, welfare or status." *Id.* § 2.12(2)(d); *compare* 24 C.F.R. § 966.53(a) (1984). They require an informal settlement conference with the project manager upon re-

ceipt of a tenant complaint, *see NCHA Rules* § 2.12(4)(c), a hearing before an impartial officer if the complaint cannot be settled, *see id.* §§ 2.12(6)–(9), review by the Administrator of the District's Property Management Administration, *see id.* § 2.12(20), and, for tenants, a right to trial *de novo* in the local courts, *see id.* §§ 2.12(19). The plaintiffs in this case do not argue that the District's grievance regulations, as such, conflict with either the Act or the accompanying HUD regulations. Instead, they contend that the defendants have, in practice, systematically failed to provide public housing tenants with an administrative grievance forum for complaints concerning the District's failure to maintain their dwelling units in accordance with the terms of their leases.

### B. *The Proceedings in This Case*

In 1983, the plaintiffs filed several administrative grievances alleging that the NCHA had failed to maintain and repair their dwelling units in accordance with their leases and the local housing code. The administrative complaints cited, among other things, the NCHA's failure to provide the plaintiffs with heat and hot water for several months;[1] the plaintiffs requested the NCHA to make the repairs necessary to bring their dwelling units in compliance with their leases and to abate a portion of their rent during the period of noncompliance. *See* Complaint ¶ 37, Joint Appendix ("J.A.") at 10; *cf. Javins v. First Nat'l Realty Corp.*, 428 F.2d 1071 (D.C.Cir.),

*cert. denied*, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970); *National Capital Housing Auth. v. Douglas*, 333 A.2d 55 (D.C.1975) (applying *Javins* to public housing). According to the complaint, the District failed either to answer the plaintiffs' grievances or to convene the informal settlement conferences required by federal regulations, *see* 24 C.F.R. § 966.54 (1984). *See* Complaint ¶ 38, J.A. at 11.

The plaintiffs then sought the formal administrative grievance hearing required under federal law, *see* 42 U.S.C. § 1437d(k); 24 C.F.R. § 966.55 (1984), but the District allegedly again failed to convene the mandated grievance procedures or even to acknowledge the hearing requests. *See* Complaint ¶¶ 40, 43, J.A. at 11. Faced with the District's apparent refusal to provide any aspect of the federally-mandated grievance procedure, the plaintiffs filed a class action suit in district court on behalf of all public housing tenants in the District. *See id.* ¶¶ 14–19, J.A. at 5–6. They argued that the District's systematic and classwide failure to implement and maintain an administrative grievance procedure for complaints concerning the operation and maintenance of public housing projects violated their federal rights under the due process clause of the fifth amendment, under the Act and its accompanying regulations, and as third-party beneficiaries of the annual funding contract between the District and the federal government.[2] *See id.* ¶¶ 1, 47, 56, 66, J.A. at 2, 12, 14, 16. With respect to

---

**1.** In particular, the complaint avers that plaintiffs Eunice Samuels, Mary Hawkins, Annie Dell Simmons and Lorraine Warren filed administrative grievances in March of 1983 alleging that the District had failed to provide them with hot water during the month of February. *See* Complaint ¶ 36, Joint Appendix ("J.A.") at 10. Plaintiffs Mary Williams and Annie Bernice Gadsden complained of an inoperable commode, a leaking roof, leaking pipes, and rodent infestation. *See* Complaint ¶ 41, J.A. at 11. Each administrative grievance alleged that the District had violated its lease with the plaintiffs which requires the District to supply heat and hot water, to maintain dwelling units in a safe and sanitary condition, and to make necessary repairs. *See generally* 24 C.F.R. § 966.4(e)(7) (1984) (listing PHA lease requirements).

**2.** The annual contributions contract between HUD and the District provides that the District "shall operate all Projects covered by this Contract in compliance with all provisions ... of the Act [and] all regulations issued by the government pursuant thereto." Annual Contributions Contract § 1.B, S.A. at 68. The plaintiffs argue that, as the intended third-party beneficiaries of the District's promise to abide by the Act and HUD regulations, they can enforce the District's implicit contractual promise under this section to provide the administrative grievance machinery required by the Act and its regulations. *See* Complaint ¶¶ 65–67, J.A. at 16; *see generally Holbrook v. Pitt*, 643 F.2d 1261 (7th Cir.1981); *infra* note 14.

their statutory claims, the plaintiffs asserted both an implied private right of action under the Act itself and an express cause of action under section 1983 for the District's violation of the Act and HUD's grievance procedure regulations. *See id.* ¶¶ 47, 58, J.A. at 12, 14. They sought declaratory relief and an injunction directing the District[3] to refrain from further violations of federal law and to provide an administrative forum for their grievances that meets the requirements of the Act and HUD regulations. *See* Prayer for Relief ¶¶ 2–4, J.A. at 17.

Before ruling on the class certification motion, the district court dismissed the plaintiffs' federal claims in a brief memorandum opinion. *See Samuels v. District of Columbia,* Civ. No. 83–2153 (D.D.C. May 10, 1984).[4] The court reasoned that the plaintiffs could not state a constitutional due process entitlement to the particular grievance procedures mandated by the Act and HUD regulations, *see id.* at 3–4, and that the Act could not be read to confer a private right of action on the plaintiffs, *see id.* at 5. The district court did not address, however, either the plaintiffs' section 1983

claim or their third-party beneficiary theory. This appeal followed.

■■■ A motion to dismiss for failure to state a claim can only be granted if "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his [or her] claims which would entitle him [or her] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *see Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980) (per curiam); *Doe v. United States Dep't of Justice,* 753 F.2d 1092, 1102 (D.C.Cir. 1985). For the purposes of such a motion, the factual allegations of the complaint must be taken as true, and all doubt concerning the sufficiency of the claim must be resolved in favor of the pleader. *See, e.g., Doe,* 753 F.2d at 1102. At issue in this appeal, then, is only whether the District's alleged classwide failure to provide an administrative grievance procedure for tenant complaints concerning the day-to-day operation of public housing projects violates federal law and whether such a violation can be remedied in a suit by tenants

---

**3.** We note that the plaintiffs specifically named the relevant District housing officials as defendants in this case. *See* Complaint at 1, J.A. at 1. Thus even on the assumption that the District can claim eleventh amendment immunity from suits in federal court, the plaintiffs' section 1983 claim would survive a sovereign immunity challenge under the well-settled principle that the eleventh amendment does not bar suits for declaratory and injunctive relief aimed at state officials. *See Kentucky v. Graham,* —— U.S. ——, —— n. 18, 105 S.Ct. 3099, 3107, n. 18, 87 L.Ed.2d 114 (1985); *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984); *Ex Parte Young,* 209 U.S. 123, 159–60, 28 S.Ct. 441, 453–54, 52 L.Ed. 714 (1908). To avoid any possible sovereign immunity problems, however, the plaintiffs may wish to amend their complaint on remand to delete the District as a nominal party in this case. *Cf. Patsy v. Florida Bd. of Regents,* 457 U.S. 496, 515–16 n. 19, 102 S.Ct. 2557, 2567–68 n. 19, 73 L.Ed.2d 172 (1982).

**4.** Although the District styled its response to the plaintiffs' complaint as a "Motion to Dismiss or in the Alternative for Summary Judgment," *see* Record Item 17, the district court clearly dismissed the complaint for failure to state a claim upon which relief can be granted. *See, e.g., Samuels,* Civ. No. 83–2153, mem. op. at 5

("[D]ismissal of this action is warranted because plaintiffs have failed to state valid federal claims."); *see also id.* at 2..

The complaint also claimed that the District's failure to provide an administrative grievance forum violated the District of Columbia Administrative Procedure Act, *see* Complaint ¶ 69, J.A. at 16, and that it constituted a breach of the District's dwelling leases with the plaintiffs, *see id.* ¶¶ 60–64, J.A. at 15. The district court declined to exercise pendent jurisdiction over these local law claims after it dismissed the plaintiffs' federal claims. *See Samuels,* Civ. No. 83–2153, mem. op. at 5; *see generally United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The plaintiffs have not appealed that aspect of the district court's order. *See* Plaintiffs' Reply Brief at 5 & n. 5. Although the plaintiffs also initially sought damages under both their federal third-party beneficiary claim, *see supra* note 2, and their local contract law claim, they have limited their appeal to a request for declaratory and injunctive relief directing the District's public housing officials to administer the federally-funded public housing program involved in this case in compliance with federal law. *See* Plaintiffs' Reply Brief at 5 & n. 5.

against the District's public housing officials.[5] Taking the plaintiffs' factual obligations as true, we now conclude that the complaint alleges a violation of both the Act and HUD's grievance procedure regulations, and that the plaintiffs can redress that violation under section 1983. Because the plaintiffs can obtain full relief under section 1983, we do not reach their other claims.

## II. THE SECTION 1983 CLAIM

 Section 1983 provides in relevant part that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or ... the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. By its terms, of course, the statute does not create substantive rights; instead it provides an express federal remedy against state officials for deprivations of rights established elsewhere in federal law. *See, e.g., Oklahoma City v. Tuttle,* — U.S. —, —, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791 (1985).[6] In *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Court explicitly confirmed that a section 1983 remedy is available to vindicate the rights secured by all federal laws.

The question before us is whether the phrase "and laws," as used in § 1983, means what it says, or whether it should be limited to some subset of laws. Given that Congress attached no modifiers to the phrase, the plain language of the statute undoubtedly embraces respondents' claim that petitioners violated the [statute].

*Thiboutot,* 448 U.S. at 4, 100 S.Ct. at 2504. The Court recognized this broad section 1983 remedy for statutory violations, moreover, even though the statute at issue in *Thiboutot* did not itself provide for private enforcement and even though Congress

---

5. Shortly after this lawsuit was filed in district court, the District acknowledged three of the named plaintiffs' hearing requests and, eventually, provided those plaintiffs with administrative relief for the particular grievances mentioned in the complaint. *See* District's Brief at 5–6 (noting that plaintiffs Samuels, Hawkins and Simmons obtained partial rent abatements in administrative hearings). We agree with the district court, however, that the District's attempt to provide partial and long-delayed relief to a few tenants does not render this case moot. *See Samuels,* Civ. No. 83–2153, mem. op. at 5. First, the defendants have not submitted any information to this court indicating that they have provided the remaining individual plaintiffs with administrative hearings. More importantly, however, the plaintiffs, who sought class certification to represent all public housing tenants in the District, allege that the District has *systematically* refused to provide an administrative forum for certain tenant complaints on a *classwide* basis. Granting relief to individual plaintiffs does not moot such a class action claim. *See Sosna v. Iowa,* 419 U.S. 393, 402 & n. 11, 95 S.Ct. 553, 559 & n. 11, 42 L.Ed.2d 532 (1975); *White v. Mathews,* 559 F.2d 852, 856–57 (2nd Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978).

6. The District cannot (and does not) argue that the plaintiffs' section 1983 claim is foreclosed by the fact that the District's formal housing regulations are consistent with federal law. By its plain terms, section 1983 provides an express federal remedy for the deprivation of federal rights by state officials irrespective of whether the alleged deprivation is due to a state "statute, ordinance, regulation, *custom, or usage.*" 42 U.S.C. § 1983 (emphasis added). Accordingly, section 1983 provides a federal remedy if the defendants' actual grievance procedure practice violates federal law, even though its formal regulations do not. *See Lynch v. Dukakis,* 719 F.2d 504, 511 (1st Cir.1983) (McGowan, J.); *see also Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). Similarly, because the plaintiffs clearly allege that District housing officials have engaged in a *systematic* practice of refusing to provide the grievance procedure mandated by federal law, *see* Complaint ¶ 1, J.A. at 2, we do not here confront any question concerning the availability of section 1983 to remedy isolated instances of official misconduct that do not rise to the level of a pattern or practice. *Cf. Tuttle,* — U.S. at — – —, 105 S.Ct. at 2433–37 (plurality opinion); *Monell,* 436 U.S. at 691–93, 98 S.Ct. at 2036–37.

had authorized a federal agency to enforce that statute against the states. *See* Sunstein, *Section 1983 and the Private Enforcement of Federal Law*, 49 U.Chi.L. Rev. 394, 394 (1982) (discussing *Thiboutot*).

The *Thiboutot* decision thus allows private parties to enforce federal laws against a special class of defendants—state and municipal actors—in much the same way that implied rights of action permit private enforcement of federal statutory obligations against any party, public or private. As courts have recognized, however, statutory section 1983 claims differ significantly from implied private rights of action. In order to establish an implied private right of action under a federal statute, a plaintiff bears a relatively heavy burden of demonstrating that Congress affirmatively or specifically contemplated private enforcement when it passed the relevant statute. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 377–78, 102 S.Ct. 1825, 1838–39, 72 L.Ed.2d 182 (1982); *Cannon v. University of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979); *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). Section 1983, however, itself creates an *express* federal cause of action

against state officials for violations of federal law, and section 1983 plaintiffs do not suffer the burden of demonstrating that Congress specifically intended to preserve the ability of private parties to enforce the relevant provisions of federal law against those officials. *See Middlesex County Sewage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 21 n. 31, 101 S.Ct. 2615, 2627 n. 31, 69 L.Ed.2d 435 (1981) ("[W]e do not suggest that the burden is on a plaintiff to demonstrate congressional intent to preserve § 1983 remedies."). Instead, Congress is, in effect, presumed to legislate against the background of section 1983 and thus to contemplate private enforcement of the relevant statute against state and municipal actors absent fairly discernible congressional intent to the contrary. *See, e.g., Keaukaha-Panaewa Community Ass'n v. Hawaiian Homes Comm.*, 739 F.2d 1467, 1470–71 (9th Cir.1984).[7]

Thus in *Sea Clammers*, the Court explicitly recognized that the availability of section 1983 to enforce federal statutory rights was subject to two "exceptions" indicating affirmative congressional intent to preclude section 1983 enforcement: (1) Congress' explicit or implicit foreclosure of private enforcement in the statutory

7. This analysis of statutory section 1983 claims is consistent with the general presumption against congressional repeals of prior statutes by implication. *See, e.g., Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 189–93, 98 S.Ct. 2279, 2299–01, 57 L.Ed.2d 117 (1978); *Wood v. United States,* 41 U.S. (16 Pet.) 342, 362–63, 10 L.Ed. 987 (1842). Such repeals are strongly disfavored on the ground that Congress is normally expected to be aware of its previous enactments and to provide a clear statement of repeal if it intends to extinguish an extant remedy. *See, e.g., Hill,* 437 U.S. at 189–93, 98 S.Ct. 2299–01. That rationale is plainly applicable here. When Congress added section 1437d(k) to the Act, section 1983 clearly provided an express federal remedy against state actors for the violation of all federal laws. Absent affirmative indications to the contrary, then, we cannot assume that Congress implicitly intended to extinguish the plaintiffs' existing ability to enforce the grievance procedure requirement under section 1983. *See generally* Sunstein, *Section 1983 and the Private Enforcement of Federal Law,* 49 U.Chi.L.Rev. 394, 420–21 (1982).

The differential approach to statutory section 1983 claims and implied private rights of action

also accords with the history and purposes of section 1983 itself. As the Court has repeatedly emphasized, that statute was expressly designed to alter federal-state relations by creating a special federal remedy for state and municipal violations of federal law. Because Congress feared that state officials would be "antipathetic" to federal rights, it chose to "interpose the federal courts between the States and the people, as guardians of the peoples' federal rights." *Mitchum v. Foster,* 407 U.S. 225, 242, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705 (1972). *See generally* Blackmun, *Section 1983 and Federal Protection of Individual Rights,* 60 N.Y.U.L.Rev. (Forthcoming 1985). It is entirely consistent with that unique goal to allow individuals to enforce federal statutes against state and municipal officials without requiring them to demonstrate that Congress affirmatively intended to preserve section 1983 remedies when it enacts each and every statute. *See* Wartelle & Louden, *Private Enforcement of Federal Statutes: The Role of the Section 1983 Remedy,* 9 Hast. Const. L.Q. 487, 536–38 (1982).

scheme itself or (2) Congress' failure to establish "enforceable rights" in the relevant statutory provision. *See Sea Clammers*, 453 U.S. at 19, 101 S.Ct. at 2625; *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 28, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981). As an example of the first such exception, the Court has stated that "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Sea Clammers*, 453 U.S. at 20, 101 S.Ct. at 2626. As an example of the second, the Court has suggested that a section 1983 action will not lie to enforce vague policy sections of federal statutes intended only to advise, rather than to mandate, a particular course of conduct. *See Pennhurst*, 451 U.S. at 28, 101 S.Ct. at 1545.

■ Under *Sea Clammers* and *Pennhurst*, then, plaintiffs can enforce all federal laws against state officials under section 1983 unless it can be shown that Congress affirmatively intended to foreclose such enforcement by failing to impose mandatory federal obligations or by creating a comprehensive remedial scheme in the statute itself. As the Court has emphasized, we should "not lightly conclude that Congress intended to preclude reliance on section 1983." *Smith v. Robinson*, —— U.S. ——, 104 S.Ct. 3457, 3469, 82 L.Ed.2d 746 (1984). With these principles in mind, we conclude that the defendants' alleged violation of the Act and its accompanying regulations does not fall within either exception to the availability of Section 1983 to enforce federal statutory law against state actors.

■ First, we cannot say that the enforcement mechanisms of the Act are sufficiently comprehensive to indicate that "Congress *specifically* foreclosed a remedy under section 1983." *Smith*, 104 S.Ct. at 3465–66 n. 9 (summarizing the *Sea Clammers* holding) (emphasis added). In *Sea Clammers* itself, the Court inferred an intent to preclude a section 1983 action only on the basis of the express and "unusually elaborate enforcement provisions" estab-

lished in the underlying statutory scheme. *Sea Clammers*, 453 U.S. at 13, 101 S.Ct. at 2622. Those provisions included the ability of federal and state agencies to seek civil penalties for statutory violations, the ability of "any interested person" to seek judicial review of federal agency action concerning the statute, and two separate citizen suit provisions specifically authorizing private parties to seek injunctions to enforce certain aspects of the statute. *See id.* at 13–14, 101 S.Ct. at 2622–23. Allowing plaintiffs to bypass those detailed procedures for administrative and judicial review, the Court concluded, would be inconsistent with the statutory scheme as a whole and would thwart Congress' judgment concerning the appropriate remedies for statutory violations. *See id.* at 13–14, 20–21, 101 S.Ct. at 2622, 2623, 2626–27; *cf. Block v. Community Nutrition Inst.*, —— U.S. ——, 104 S.Ct. 2450, 2454–56, 81 L.Ed.2d 270 (1984) (applying a similar analysis to infer congressional intent to preclude judicial review of agency action).

Other courts have also required government defendants to demonstrate extensive statutory enforcement mechanisms, including access to administrative and judicial review, in order to establish an implicit congressional intent to foreclose section 1983 enforcement of federal law against state officials. *See, e.g., Tyler v. Pasqua*, 748 F.2d 283, 286–87 (5th Cir.1984) (looking to the "elaborate remedial measures" of the Food Stamp Act, 7 U.S.C. § 204 *et seq.*); *Hawaii Dep't of Educ. v. Katherine D.*, 727 F.2d 809, 820 (9th Cir.1983) (noting the detailed administrative and judicial review provisions of the Education for All Handicapped Children Act, 20 U.S.C. § 1401 *et seq.*), *cert. denied*, —— U.S. ——, 105 S.Ct. 2360, 86 L.Ed.2d 260 (1985); *Powell v. Defore*, 699 F.2d 1078 (11th Cir.1983) (same); *Uniformed Firefighters Ass'n, Local 94 v. City of New York*, 676 F.2d 20, 22–23 & n. 4 (2nd Cir.) (same for the Comprehensive Employment and Training Act, 29 U.S.C. § 801 *et seq.*), *cert. denied*, 459 U.S. 838, 103 S.Ct. 84, 74 L.Ed.2d 79 (1982).

The Housing Act, by contrast, does not expressly establish *any* administrative or judicial remedy for violations of the grievance procedure requirement. *See Beckham v. New York City Housing Auth.*, 755 F.2d 1074, 1077 (2d Cir.1985) (concluding that tenants could enforce the Act's rent calculation standards against local PHAs in a section 1983 action); *cf. Howard v. Pierce*, 738 F.2d 722, 729 (6th Cir.1984). Accordingly, the District cannot argue that section 1983 enforcement of that federal requirement will thwart any detailed and elaborate statutory enforcement scheme. Moreover, we are not prepared to conclude that HUD's implicit ability to withhold federal funds when local PHAs violate federal law constitutes an enforcement mechanism sufficiently comprehensive to imply that Congress intended to foreclose section 1983 remedies. *Cf. Cannon*, 441 U.S. at 704–07, 99 S.Ct. at 1961–63 (concluding that the ability of plaintiffs to petition federal agencies to terminate federal funding for statutory violations does not imply congressional intent to preclude an implied right of action). Terminating federal funds is a drastic remedy, rarely imposed, that only serves to injure the intended beneficiaries. *See id.* at 704–05, 708 n. 42, 99 S.Ct. at 1963 n. 42. As other circuits have consistently recognized, the first *Sea Clammers* exception cannot be sensibly applied to preclude a section 1983 action on the basis of such an equivocal indication of congressional intent. *See, e.g., Keaukaha*, 739 F.2d at 1471; *Lynch v. Dukakis*, 719 F.2d 504, 510–11 (1st Cir.1983) (McGowan, J.); *Crawford v. Janklow*, 710 F.2d 1321, 1326 (8th Cir.1983).[8] We decline to do so here.

■ Turning to the second exception to the availability of statutory section 1983 actions, we agree with the plaintiffs that the provisions of federal law involved in this case create "rights" enforceable under section 1983. The *Pennhurst* Court indicated that Congress establishes such rights when it explicitly mandates state officials to act in accordance with particular statutory standards. *See Pennhurst*, 451 U.S. at 20, 28, 101 S.Ct. at 1541, 1545. In *Pennhurst* itself, for example, the Court suggested that a statutory provision describing congressional "findings respecting the rights" of the disabled did not impose upon state institutions a mandatory duty to afford disabled patients a least restrictive treatment environment. *See id.* at 18–27, 101 S.Ct. at 1540–45. Instead, the Court concluded, the relevant statutory language and extensive legislative history indicated that the policy section of the act before it was only intended as a precatory statement of congressional preference, at most a "nudge in the preferred directions." *Id.* at 19, 101 S.Ct. at 1541 (quoting *Rosado v. Wyman*, 397 U.S. 397, 413, 90 S.Ct. 1207, 1218, 25 L.Ed.2d 442 (1970)).[9]

---

**8.** As the Court noted in a pre-*Thiboutot* case involving the private enforcement of federal welfare law:

> We have considered and rejected the argument that a federal court is without power to review state welfare provisions or prohibit the use of federal funds by the States in view of the fact that Congress has lodged in the Department of HEW the power to cut off federal funds for noncompliance with statutory requirements. We are most reluctant to assume Congress has closed the avenue of effective judicial review to those individuals most directly affected by the administration of its program.

*Rosado v. Wyman*, 397. U.S. 397, 420, 90 S.Ct. 1207, 1222, 25 L.Ed.2d 442 (1970); *see Thiboutot*, 448 U.S. at 4, 100 S.Ct. at 2504 (citing *Rosado* as an example of the Court's implicit reliance on section 1983 to vindicate federal statutory rights against state officials); *Lynch*, 719 F.2d at 510–11.

**9.** In its only response to the plaintiffs' section 1983 claim, the District suggests that *Pennhurst* precludes section 1983 enforcement of the grievance procedure requirement unless the plaintiffs can independently establish an implied private right of action under the Act. For the reasons discussed above, we cannot accept that view. *See supra* p. 194. Section 1983 creates an express federal remedy for state and municipal violation of federal law which, under *Pennhurst*, can only be defeated through a clear showing that Congress did not intend the relevant statute to create binding federal obligations.

The *Pennhurst* Court also suggested that Congress' failure to provide federal funds to defray the "massive" costs of implementing the rights asserted by the plaintiffs in that case indicated that Congress did not intend the relevant statutory provision to impose binding obligations on the states. *See Pennhurst*, 451 U.S. at 22–24, 101

On any fair reading, we believe, the Act's grievance procedure provision subjects local PHAs to mandatory obligations within the meaning of *Pennhurst.* In sharp contrast to the statutory provisions at issue in that case, section 1437d(k) is codified in the operative body of the Act, and its language is unequivocally specific and mandatory. The provision plainly provides that HUD *"shall ... require* each public housing agency receiving assistance under this chapter to establish and implement an administrative grievance procedure," 42 U.S.C. § 1437d(k) (emphasis added), and it uniformly speaks of a tenant's *entitlement* to particular procedural protections in the face of adverse PHA action, *see id.* § 1437d(k)(4)–(6).[10] HUD's regulations are equally mandatory and specific. *See* 24 C.F.R. §§ 966.50–966.59 (1984). The legislative history of this provision also confirms Congress' clear intent to require local PHAs to provide an administrative grievance procedure for public housing tenants. *See House Report* at 35 ("The bill provides that the grievance procedures *shall be available* for all disputes.") (emphasis added); *see also* 29 Cong.Rec. H3659 (daily ed., June 6, 1983) (statement of Rep. Coyne). The plainly mandatory character of the obligation imposed on local PHAs by section 1437d(k) itself suffices to convince us that Congress did not intend the grievance procedure requirement as a hortatory expression of congressional preference. *See, e.g., Beckham,* 755 F.2d at 1077 (mandatory statutory language cre-

ates enforceable rights within the meaning of section 1983); *Alexander v. Polk,* 750 F.2d 250, 259 (3d Cir.1984) (same); *Keaukaha,* 739 F.2d at 1467 (same); *Crawford,* 710 F.2d at 1326 (same).

The particular historical context of section 1437d(k), moreover, further confirms that the grievance procedure provision was intended to impose mandatory obligations on local PHAs. Congress added that provision to the Act in response to a 1982 HUD proposal to eliminate any federal requirement that PHAs provide tenants an administrative grievance procedure for complaints concerning the day-to-day operation of public housing projects. *See supra* pp. 189–190. HUD specifically proposed to replace the grievance procedure requirement with a general statement permitting, but not mandating, such procedures to the extent that local PHAs found them useful. *See* 47 Fed.Reg. 55,686, 55,692 (Dec. 13, 1982). Congress, in turn, plainly rejected that advisory approach and concluded instead that administrative grievance procedures were sufficiently worthwhile to be required under the Act itself.

The Committee bill requires the Secretary to establish lease and grievance procedures for public housing. HUD has proposed to repeal existing regulations concerning these procedures. These existing regulations were initially developed in 1971, after extensive consultation by this Department with representatives of housing authorities and tenants.

S.Ct. at 1542–43. That consideration is apparently not significant here because the District is not obliged to finance the costs of the public housing involved in this case. Instead, those costs are borne by the tenants (through rental payments) and the federal government (through grants). *See* 42 U.S.C. §§ 1437c(a), 1437g. Although the District is required to waive real estate and certain other local taxes for housing projects funded under the Act, *see id.* § 1437d(d), and those costs will not be affected by enforcement of the grievance procedure requirement. In any event, the District does not argue that the grievance procedure requirement imposes "massive" unfunded operating costs on local PHAs on anything approaching the scale involved in *Pennhurst.* We also note that Congress believed that requiring an alternative dis-

pute resolution forum would *reduce* public housing costs by discouraging expensive tenant-management litigation. See *House Report* at 35; *infra* pp. 200–01.

10. We do not believe that the mandatory character of the grievance procedure provision is altered by the fact that Congress directed HUD to issue binding regulations implementing section 1437d(k). Congress regularly assigns agencies the task of explicating statutory requirements through regulations, and nothing in the legislative history of section 1437d(k) suggests that Congress thought the grievance procedure provision any less mandatory because it directed HUD to specify the precise content of the required procedures in future regulations. *See infra* pp. 200–01.

They grew out of dissatisfaction with the practices of some, but not all, PHAs that caused unfairness in the leasing and operation of PHA projects. They ... were designed to provide a realistic means for resolving disputes between tenants and PHA's quickly and fairly, before the problems fester and hostilities develop....

Given that history, it is the judgment of the Committee that these lease and grievance requirements must be retained.

*House Report* at 35. Congress' clear rejection of HUD's proposal and its decision to add an explicit grievance procedure requirement to the Act strongly indicate that section 1437d(k) was intended to create enforceable section 1983 rights within the meaning of *Pennhurst.*

Similarly, we note that the HUD's original grievance procedure regulations were themselves the subject of extensive litigation after their initial adoption in 1971. In those cases, courts consistently entertained tenant challenges to PHA action or inaction based on the grievance procedure regulations and they consistently held those regulations mandatory and binding on PHAs. *See, e.g., Chicago Tenants Housing Org. v. Chicago Housing Auth.,* 512 F.2d 19, 22–23 (7th Cir.1975) (PHA bound under circulars 8 and 9 to provide grievance procedures for tenant complaints of housing code violations); *Brown v. Housing Auth.,* 471 F.2d 63, 67 (7th Cir.1972) (enjoining PHA eviction for failure to comply with circular 9); *Glover v. Housing Auth.,* 444 F.2d 158, 161–62 (5th Cir.1971) (same); *cf.*

*King v. Housing Auth,* 670 F.2d 952, 954–56 (11th Cir.1982) (enforcing grievance procedure regulations against PHA).[11] We believe it reasonable to assume that Congress was aware of the enforcement history of the very regulatory scheme it chose to codify in the Act. *See Merrill Lynch,* 456 U.S. at 378–82, 102 S.Ct. at 1839–41; *Cannon,* 441 U.S. at 696–97, 99 S.Ct. at 1957–58. The legislative history of section 1437d(k) refers to that enforcement, *see House Report* at 35, and the existence of contemporaneous judicial enforcement of HUD's regulations against PHAs at least weighs substantially against the argument that section 1437d(k) was intended only as a precatory statement of congressional preference. In light of the explicitly mandatory language of section 1437d(k) and this strong legislative history, we conclude that *Pennhurst* does not prevent the plaintiffs from enforcing the grievance procedure requirement in a section 1983 suit.

In sum, we hold that the plaintiffs' section 1983 claim does not fall within the exceptions to *Thiboutot* recognized in *Sea Clammers* and *Pennhurst.* Congress clearly intended to require local PHAs to provide an administrative grievance procedure for tenant complaints of adverse PHA action, and nothing in the structure or history of the Act indicates that Congress intended to foreclose private enforcement of that obligation. If anything, we believe, the District's alleged administration of federally-funded public housing in defiance of explicit and mandatory federal law occasions a core application of section 1983 as that statute was interpreted in *Thiboutot.*[12]

11. In *Thorpe v. Housing Auth.,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), moreover, the Supreme Court held that a tenant could enforce an earlier version of Circulars 8 and 9 against a local PHA, expressly concluding that HUD's administrative eviction procedures were "mandatory, not merely advisory." *Id.* at 276, 89 S.Ct. at 523.

12. We note that the Fourth Circuit has apparently taken a somewhat different view of the availability of section 1983 to enforce the Act. In *Perry v. Housing Auth.,* 664 F.2d 1210 (4th Cir. 1981), that court declined to entertain a section 1983 claim seeking both damages and injunctive

relief for a PHA's alleged failure to maintain "decent, safe and sanitary dwellings" in accordance with the general policy section of the Act, 42 U.S.C. § 1437. In *Phelps v. Housing Auth.,* 742 F.2d 816 (4th Cir.1984), the court likewise upheld the dismissal of a section 1983 action based on the Act's tenant selection criteria and procedures, 42 U.S.C. §§ 1437d(c)(4)(A), 1437d(c)(3)(ii).

We think both decisions are distinguishable. *Perry* simply held that Congress did not intend the broad policy provisions of the Act to create specific rights enforceable under section 1983. *See Perry,* 664 F.2d at 1217–18. That conclusion, which follows directly from *Pennhurst,*

### III. THE ALLEGED VIOLATIONS OF FEDERAL LAW

The defendants also argue that, even assuming the availability of section 1983 to enforce federal housing law against PHAs, their alleged failure to provide an administrative grievance procedure for the plaintiffs' specific complaints of inadequate maintenance does not violate the actual requirements of the Act. Specifically, the defendants contend that Congress' reference to "proposed adverse public housing authority action" in a subsection of section 1437d(k), *see* 42 U.S.C. § 1437d(k)(1), indicates that Congress intended to mandate a grievance procedure only when a PHA actively "proposes" to take some "affirmative" future "action"—e.g., to raise rent or terminate a tenancy—not when a PHA fails to act. Because a PHA does not "propose" to violate its lease obligations, they reason, section 1437d(k) cannot be read to require an administrative grievance forum when tenants complain of improper maintenance or disrepair. We reject this act/omission distinction as applied to the grievance procedure requirement.

 First, the regulations implementing section 1437d(k) plainly require an administrative grievance procedure for *any* adverse PHA "action or failure to act" involving a tenant's lease or the PHA's regulations. 24 C.F.R. §§ 966.51(a), 966.-53(a) (1984). Thus the plaintiffs clearly allege that the District's public housing officials have violated the applicable HUD regulations, and that allegation alone, we think, states a cognizable section 1983 claim under the circumstances of this case. HUD's grievance procedure regulations clearly have the full force and effect of federal law: they are issued under a congressional directive to implement specific statutory norms and they affect individual rights and obligations. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 301–03, 99 S.Ct. 1705, 1716–18, 60 L.Ed.2d 208 (1979) (describing such substantive or legislative regulations); *Morton v. Ruiz*, 415 U.S. 199, 232–36, 94 S.Ct. 1055, 1073–75, 39 L.Ed.2d 270 (1974) (same). While *Thiboutot* involved a statutory violation, the Court's broad analysis of the "laws" clause of section 1983 indicates that section 1983 provides a legal remedy for the violation of all valid federal laws, including at least those federal regulations adopted pursuant to a clear congressional mandate that have the full force and effect of law. Such regulations have long been recognized as part of the body of federal law, *see, e.g., Chrysler*, 441 U.S. at 301–03, 99 S.Ct. at 1716–18, and *Thiboutot* expressly held that Congress did not intend to limit section 1983 to some subset of federal laws. *See Thiboutot*, 448 U.S. at 4, 100 S.Ct. at 2504.

In our view, this dispute presents perhaps the strongest case for permitting the enforcement of federal regulations in a section 1983 action. Here, Congress explicitly directed HUD to issue mandatory grievance procedure regulations designed to ensure PHA compliance with the detailed requirements of section 1437d(k). *See* 42 U.S.C. § 1437d(k). Congress was also clearly aware of the present regulations when it added the grievance procedure provision to the Act, and it clearly enacted section 1437d(k) to preserve the current regulatory structure. *See supra* p. 190. At least where Congress directs regulatory action, we believe that the substantive federal regulations issued under Congress' mandate constitute "laws" within the meaning of section 1983. We therefore hold that the plaintiffs state a valid section 1983 claim for the defendants' alleged vio-

does not control the plaintiffs' attempt in this case to enforce a detailed and explicitly mandatory provision of the Act. *See supra* pp. 197–98. Although *Phelps* involved a more specific section of the Act, the Fourth Circuit eventually determined that Congress intended local PHAs to balance several competing tenant selection criteria and therefore did not establish enforceable rights to any particular selection standard.

*See Phelps*, 742 F.2d at 821–22. Even assuming that *Phelps* was rightly decided, its rationale could not apply here. Nothing in the Act, its legislative history or HUD regulations suggests that Congress intended to commit the decision of whether to provide an administrative grievance procedure to the discretion of individual PHAs.

lation of HUD's grievance procedure regulations. *See Billington v. Underwood*, 613 F.2d 91, 93–94 (5th Cir.1980) (per curiam) (enforcing analogous Housing Act regulations under section 1983); *Alexander*, 750 F.2d at 259–61 (WIC regulations); *Cunningham v. Toan*, 728 F.2d 1101, 1103–05 (8th Cir.1984) (AFDC regulations), *vacated*, — U.S. ——, 105 S.Ct. 896, 83 L.Ed.2d 912 (1985) (ordering further consideration in light of statutory developments). *See also Guardians Ass'n v. Civil Serv. Comm. of New York*, 463 U.S. 582, 608 n. 1, 103 S.Ct. 3221, 3235 n. 1, 77 L.Ed.2d 866 (Powell, J., concurring in the judgment) (suggesting the applicability of *Thiboutot* to federal regulations); *id.* at 638 & n. 6, 103 S.Ct. at 3252 & n. 6 (Stevens, J., dissenting) (same).

■ We also believe, moreover, that section 1437d(k) itself must be read to require local PHAs to provide an administrative grievance forum for the underlying tenant complaints in this case. The legislative history of that provision strongly indicates that Congress did not intend its reference to PHA "action" to result in a massive exclusion of certain tenant complaints from the scope of the grievance procedure requirement. As we noted above, HUD's 1982 rulemaking specifically proposed to eliminate mandatory grievance procedures for tenant complaints (such as the plaintiffs') concerning the day-to-day operation of public housing projects. Congress explicitly rejected that attempt to limit the grievance procedure requirement when it enacted section 1437d(k), and in doing so it clearly intended to mandate a regulatory framework that required an administrative forum for all tenant disputes.

[I]t is the judgment of the Committee that these lease and grievance requirements must be retained. Thus, the bill adds a new subsection ... under which the Secretary must by regulation require PHAs to maintain grievance procedures and utilize fair leases. *The Committee contemplates that HUD will meet this obligation by retaining the present regulations. The bill provides that the grievance procedures shall be available for all disputes between a PHA and an applicant, a tenant or a former tenant.* The hearings shall be made available on an administrative level, because attempting to resolve these matters only in court is not a desirable, efficient and effective approach.

*House Report* at 35–36 (emphasis added); *see also* 129 Cong.Rec. H3659 (daily ed. June 6, 1983) (statement of Rep. Coyne). The legislative history also explicitly refers to tenant complaints concerning PHA operation of public housing projects. *See House Report* at 35; *supra* p. 22. Congress thus broadly understood section 1437d(k) to encompass all tenant disputes covered under the extant HUD regulations without regard to any distinction between PHA action and inaction.[13]

As this legislative history also indicates, section 1437d(k), like HUD's original grievance procedure regulations, is aimed at avoiding costly and divisive litigation between tenants and PHAs. Congress determined that the benefits of avoiding tenant-management litigation outweighed the fed-

---

**13.** The District's strained reading of section 1437d(k) also breeds irrational results when applied to other contexts in which PHAs are required to provide an administrative forum for tenant grievances. Under 42 U.S.C. § 1437a, for example, PHAs are required to calculate tenant rent according to a complex statutory formula based on a tenant's adjusted family income. A tenant's rent thus varies according to fluctuations in his or her adjusted income, *see* 24 C.F.R. §§ 899.101–899.105 (1984), and PHAs are required to review rent calculation at least once a year, *see* 42 U.S.C. § 1437a(a). When a PHA raises a tenant's rent to reflect allegedly increased tenant income, no one doubts that sec-

tion 1437d(k) requires the PHA to provide an administrative hearing if the tenant complains of the increase. *See, e.g.,* District's Brief at 19. Under the District's reading of the grievance procedure requirement, however, a PHA's "failure" to lower rent under section 1437a when a tenant's income decreases is not subject to an administrative hearing because the PHA has not "proposed" to take any "action." We do not believe that Congress could have intended such a surprising application of the grievance procedure requirement without some express indication that PHA inaction is excluded from the scope of section 1437d(k).

eral costs of providing alternative dispute resolution machinery. That rationale is equally applicable to tenant complaints concerning adverse PHA "action" and those concerning adverse "inaction." Both types of tenant complaints can give rise to costly litigation that drains PHA resources and strains tenant-management relations, and both can be more expeditiously resolved in an administrative forum. We will not disregard this straightforward congressional purpose by reading an act/omission distinction into the statute.

 We therefore hold that the plaintiffs have alleged a violation of both section 1437d(k) and HUD's grievance procedure regulations. Because the plaintiffs can redress that violation in a section 1983 action, we need not and do not consider whether the plaintiffs could also succeed under their constitutional, implied private right of action and third-party beneficiary theories.[14]

14. We therefore do not decide whether the plaintiffs could obtain relief as third-party beneficiaries of the District's annual contributions contract with HUD under which the District generally promises to obey the Act and relevant HUD regulations. *See supra* note 2. We note, however, that courts remain divided over whether public housing tenants can assert enforceable rights as third-party beneficiaries of the federal funding contracts between HUD and local PHAs. *Compare, e.g., Perry v. Housing Auth.,* 664 F.2d 1210, (4th Cir.1981) (rejecting a third-party beneficiary claim) *with, e.g., Holbrook v. Pitt,* 643 F.2d 1261, 1269–73 (7th Cir. 1981) (accepting such a claim). *See generally* Note, *Third Party Beneficiary and Implied Right of Action Analysis: The Fiction of One Government Intent,* 94 Yale L.J. 875, 888–90 (1985).

In *Ashton v. Pierce,* 716 F.2d 56 (D.C.Cir.), *amended,* 720 F.2d 70 (D.C.Cir.1983), this court concluded that tenants could require *HUD* to monitor PHA compliance with certain lead-based paint elimination standards under a similar third-party beneficiary theory. We did so, however, only in light of Congress' clear intent to require such enforcement. *See id.* at 66. In *Knox-Hill Tenant Council v. Washington,* 448 F.2d 1045 (D.C.Cir.1971), we also suggested the possibility that tenants could assert third-party beneficiary rights against *local PHAs. See id.* at 1057–58. While we do not decide whether the plaintiffs could bring such a third-party beneficiary claim here, we wish to emphasize that section 1983 provides a far more straightforward basis for redressing PHA violations of

## IV. CONCLUSION

 In conclusion, we wish to emphasize the limits of our holding in this case. We conclude only that the complaint before us states a claim upon which relief can be granted under section 1983. In enacting section 1437d(k), Congress clearly determined that the unique problems of federally-funded public housing required a federally-imposed administrative grievance forum for a wide range of tenant grievances. The defendants' alleged systematic failure to provide public housing tenants an administrative forum for complaints of inadequate maintenance and repair violates that mandatory federal obligation as expressed in both the Act and its accompanying regulations. Moreover, nothing in the language, structure or legislative history of the Act indicates that Congress intended to foreclose the enforcement of that obligation in a section 1983 action. If the plaintiffs can in fact prove that the District's public housing officials have system-

federal law and for determining which public housing claims belong in federal court. We do not believe, for example, that an individual public housing tenant could bring a section 1983 action for a public landlord's random and unauthorized failure to maintain properly her dwelling unit on the theory that such action violates the provision of the Act which calls for "decent, safe and sanitary dwellings." 42 U.S.C. § 1437. *Cf. Perry,* 664 F.2d at 1218 (holding that section 1437 does not create enforceable rights within the meaning of section 1983). Such a limit on the availability of section 1983 to challenge PHA action is entirely reasonable given the congressional design of federally-funded public housing. Nothing in the language or history of the Act indicates that Congress intended the broad policy provisions of the Act to create a federal remedy for every aspect of public landlord-tenant relations, *cf. Perry,* 664 F.2d at 1218, and we would be extremely reluctant to read those provisions to create a federal warrant of habitability enforceable under section 1983 in individual landlord-tenant disputes. To the extent that the plaintiffs' third-party beneficiary theory could be extended to establish a federal cause of action for such discrete and random disputes, we think it would be plainly inconsistent with the structure of federal housing law.

Judge Friedman does not join this footnote because he does not consider it necessary to the disposition of this case.

atically failed to provide administrative grievance machinery for tenant complaints of disrepair, they are entitled to an order directing those officials to administer the federally-funded public housing program involved in this case in compliance with the requirements of section 1437d(k) and the applicable HUD regulations. We leave the precise scope and content of any such prospective relief to the district court to determine on remand.

The district court's dismissal of the plaintiffs' section 1983 claim is accordingly reversed and the case is remanded.

*Reversed and remanded.*