Eunice **SAMUELS**, et al., Plaintiffs,

v.

**DISTRICT OF COLUMBIA**, et al., Defendants.

Civ. A. No. 83–2153.

United States District Court, District of Columbia.

Aug. 14, 1987.

Gaines H. Cleveland, Covington & Burling, Joel Polin, Washington, D.C., for plaintiffs.

O. Gregory Lewis, Asst. Corp. Counsel for the District of Columbia, Washington, D.C., for defendants.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

Plaintiffs, Eunice Samuels, Mary Hawkins, Annie Simons, Lorraine Warren, Annie Gadsden and Mary Williams, are tenants of public housing facilities owned and

operated by the District of Columbia National Capital Housing Authority ("NCHA"). In March 1983, they complained to the NCHA and to the Property Management Administration ("PMA")[1] officials about lack of heat and hot water in their dwelling units. Those conditions had persisted for some time; nonetheless, responsible officials of the NCHA had ignored their complaints for five months. Indeed, it was only after this lawsuit was filed that their grievances were acknowledged.

The six plaintiffs have been certified as class representatives of all current and future tenants in public housing properties maintained by the District of Columbia. They request relief under section 1983 of the Civil Rights Act of 1871. That section provides citizens with an express remedy for the deprivation of federal rights by state officials acting "under color of any statute, ordinance, regulation, custom or usage of any State ... or the District of Columbia." 42 U.S.C. § 1983; *see also* Pub.L. 96–170, 93 Stat. 1284 (1979) (extending section 1983 to citizens of the District of Columbia). Plaintiffs also rely upon and allege that the Federal Housing Act of 1937, as amended, 42 U.S.C. § 1437d(k) ("Housing Act" or "Act") and accompanying regulations of the Department of Housing and Urban Development ("HUD"), 24 C.F.R. §§ 966.50 *et seq.* (1986) (originally promulgated in 1975) require that all local public housing agencies accepting federal funds, implement grievance procedures for tenants which comply with certain minimum federal guidelines. They charge that the District of Columbia and NCHA officials have failed to develop and place in operation effective procedures designed to achieve a speedy resolution of tenant complaints, have been indifferent to their complaints addressing poor maintenance of public housing accommodations, and have otherwise failed to provide on a regular basis commonly recognized requirements for a tenant's welfare—heat and hot water.

Plaintiffs' challenge to the District's existing regulatory scheme is twofold: First, they contend that even if the NCHA's formal, written grievance procedures comply with federal requirements, the District has continually and deliberately failed to implement and administer the system. They also contend that several NCHA regulations, specifically those covering the limitations period for filing grievances, the notice provisions, the selection of hearing officers, and the administrative review process, are facially inconsistent with prevailing federal standards and should be struck down as a matter of law.[2]

Plaintiffs seek declaratory and injunctive relief against the District of Columbia, Mayor Marion S. Barry, and responsible officials of the NCHA. The Mayor and the individual defendants are sued in their official capacities. Plaintiffs request this Court to enter an order directing the defendants to establish and implement an administrative grievance procedure for resolving tenant complaints dealing with repeated and frequent substandard conditions in their housing accommodations.

The parties have pursued extensive discovery and plaintiffs now seek relief by way of summary judgment. The material

---

1. Both the NCHA and the PMA are units within the District of Columbia Department of Housing and Community Development ("DHCD"), an executive agency of the District of Columbia government. The NCHA is charged with providing low rent housing. The PMA is charged with managing and maintaining the public housing units. Presently, the agencies own and operate over 50 public housing properties which furnish 11,769 units capable of housing approximately 40,000 tenants (NCHA 1986 Annual Report).

2. This proceeding was dismissed at an early stage on grounds that adequate relief was available in the local District of Columbia courts. *Samuels v. District of Columbia,* Civ. No. 83–2153 (D.D.C. May 10, 1984). Plaintiffs appealed and our Circuit Court concluded that plaintiffs stated a cause of action under the Housing Act and section 1983 of the Civil Rights Act. *See Samuels v. District of Columbia,* 770 F.2d 184 (1985). Thereafter, the parties conducted extensive settlement negotiations and appeared near to agreeing on a comprehensive consent decree. However, those efforts failed. The parties then renewed their discovery efforts in preparation for trial.

facts are undisputed[3] and only questions of law are presented.

For the reasons set forth below, the Court determines that plaintiffs have clearly demonstrated that they are entitled to the relief requested and that their motion for summary judgment should be granted.

**I.**

*A. Federal Procedures and Regulations*

For a number of years, HUD regulations have required local public housing agencies ("PHA") to recognize certain tenant rights and to provide a grievance procedure to redress tenants' complaints. Those requirements were reinforced in 1983 when Congress amended the Housing Act and specifically required HUD to promulgate regulations imposing a duty upon each PHA "to establish and implement an administrative grievance procedure." 42 U.S. C. § 1437d(k).[4]

To effectuate and ensure implementation of the Act, HUD promulgated regulations which apply to this litigation. They provide in relevant part that each PHA establish and implement a procedure

> to assure that PHA tenants are afforded an opportunity for a hearing if the tenant disputes within a *reasonable* time any PHA action or failure to act involving the tenant's lease with the PHA or PHA regulations which adversely affect the individual tenant's rights, duties, welfare or status. (emphasis added)

24 C.F.R. 966.50. The regulations prescribe procedures for resolution of tenant disputes. Once a tenant presents a grievance, either orally or in writing, the PHA is required to conduct an informal grievance conference to discuss and attempt resolution of the dispute without a hearing. After the conference, the PHA must prepare a written summary of the discussion which includes the proposed disposition and an explanation of the procedures for appealing the decision. *Id.* at 966.54.

If dissatisfied with the informal grievance conference, the tenant may request a hearing before an impartial hearing officer. The request must be submitted in writing "within a reasonable time after receipt of the summary of discussion." *Id.* at 966.-55(a). A hearing officer is then selected through an agreed-upon procedure between the local housing agency and the grievant. The hearing officer schedules a hearing "promptly" at a time convenient to the parties. The officer must render a written decision within a "reasonable time after the hearing." *Id.* at 966.57(a).

HUD adopted the regulations to ensure that *all* public housing tenants had access to a grievance procedure. The regulations were designed "to avoid costly and divisive public housing litigation by channeling tenant-management disputes into a decentralized, informal, and relatively non-adversarial administrative process." *Samuels v. District of Columbia,* 770 F.2d 184, 189 (D.C.Cir.1985); *Brown v. Housing Authority,* 471 F.2d 63, 66–67 (7th Cir.1972).

Congress and HUD have long envisioned and recognized that

> the establishment of a grievance procedure by *every* local housing authority, embodying certain standards and criteria, [will] improve management-tenant re-

---

**3.** There is no factual dispute regarding the District's failure to implement a grievance procedure. The plaintiffs took numerous depositions of housing officials and examined records of the NCHA concerning its grievance procedure. The investigation demonstrated that over two-thirds of grievances were never responded to and those that were, were subject to extensive delays. *See* Affidavit of Sten Jensen, Research Assistant at Covington & Burling, plaintiffs' chief counsel, filed on April 10, 1987.

**4.** The regulations governing the grievance procedure date back to 1971. At that time, HUD required the PHAs to provide an administrative

grievance forum to resolve tenant complaints. These requirements were codified and published as regulations in 1975. In 1982, the current administration sought to revise and severely limit the grievance procedure. *See* 47 Fed.Reg. 55,689 (1982). In response, Congress amended the Housing Act to incorporate the grievance procedure as a statutory mandate. *See* Housing and Urban-Rural Recovery Act of 1983. Congress contemplated that HUD would effectuate the provisions of the Act and "meet [its] obligation by retaining the present regulations." *See* H.R.Rep. No. 123, 98th Cong., 1st Sess. 35 (1983).

lationships and promote [an] improved housing environment to the advantage of the low-rent public housing program thus implementing the national housing policy as expressed by Congress. (emphasis added)

Circular RHM 7465.9 (Feb. 22, 1971), Statutory Addendum at 21. Accordingly, every local public housing authority receiving federal funding has been required to implement a grievance procedure in accordance with the federal regulations.

### B. *District of Columbia Procedures and Regulations*

Throughout the period of this litigation, the operative local grievance procedures were the 1978 NCHA Rules and Regulations. Those rules had been in place for some time and loosely followed the format specified in the HUD regulations. An informal settlement conference was provided with recourse to a formal hearing if the problems were not resolved informally. But, as plaintiffs' counsel noted and argued, several of the provisions directly conflicted with federal regulations and in any event, the entire procedure was effectively ignored and never enforced.

The District of Columbia promulgated new regulations, effective January, 1987. 33 D.C.Reg. 7973, 8011–21 codified at 1100.1 *et seq.* Plaintiffs allege that the new regulations essentially recodified the old ones without remedying any of the blatant inconsistencies with the federal standards. They concede that the new rules have made some improvements. For example, they no longer require that grievances must be submitted in writing (a clear violation of 24 C.F.R. 966.54 which explicitly provided that grievances could be submitted either in writing *or* orally). The rules also permit hearing officers to grant equitable relief, a direct response to this Court's November 26, 1986, ruling, *Samuels v. District of Columbia,* 650 F.Supp. 482 (D.D.C.1986).

But, as plaintiffs point out, the 1987 rules present serious problems and are flawed. The rules retain a questionable 10-day statute of limitations and provide for an equally questionable selection process for hearing officers. Plaintiffs also contend that the new rules fail to provide tenants with adequate notice of their rights to seek a hearing and grant the Administrator overly broad discretion to overturn a hearing officer's decision. These matters are discussed, *infra* pp. 1140–44.

### C. *Implementation of the District's Grievance Procedure*

The genesis of this class action was the District's failure to recognize and to respond in a timely fashion to the complaints of individually named tenants that their public housing accommodations lacked basic facilities and the District's failure to grant an administrative hearing. The District did not schedule a hearing to resolve the tenants' March grievances until August 1983—some five months after the tenants filed their grievances and shortly after this lawsuit was filed. Mr. Michael Williams, Chief of Management, Property Management Administration, conceded that there was a failure to schedule a hearing "promptly" as required by the HUD regulations. 24 C.F.R. 966.55(f). He explained that the delay was probably due to the property manager's failure to follow the NCHA rules and regulations. He further admitted that "the small amount of training concerning the implementation of the grievance procedure given to the property managers" "contributed to the delay." Plaintiffs' Third Set of Interrogatories, 2d Supp.Ans. 3(a), & 3(k) (filed September 22, 1986).

The named plaintiffs' unfortunate experiences reflect what might be aptly described as standard NCHA operating procedure. The thorough and extensive discovery undertaken by plaintiffs' counsel showed that the majority of tenants who filed grievances likewise never received responses from the District government.[5] Affidavit

---

5. In collecting their data, the plaintiffs only considered those matters which fit the federal definition of a grievance. 24 C.F.R. 966.53(a):

'Grievance' shall mean any dispute which a tenant may have with respect to PHA action or failure to act in accordance with the indi-

of Sten Jensen, *supra.* In arriving at this figure, counsel reviewed tenant files at ten representative[6] public housing properties and examined all tenant grievances recorded from January 1, 1980 to the present. Jensen Aff. at ¶¶ 2, 3. They also examined files relating to tenants' grievances maintained by the District of Columbia Corporation Counsel's Office and outside counsel. The plaintiffs' diligent and systematic research revealed that 61.8 percent of the complainants never received *any* response from the housing authority. *Id.* at ¶ 10. Those 31.4 percent who received a response from the District were required to wait for an average of 353 days, before obtaining a final resolution of their grievance. *Id.* Ex. G.

This average response time was intolerable, particularly when the delays often resulted in a long-term loss and deprivation of basic necessities for personal welfare and comfort. The delays far exceeded the contemplated response time. Federal regulations require that the housing authorities respond to a tenant's grievance within a "reasonable" time. 24 C.F.R. 966.57(a). A response time of one year scarcely falls within that definition. Nor did the response time conform to District rules, at least as they then existed. The earlier 1978 NCHA Rules required the property managers to "forward immediately" a complaint to the appropriate management supervisor. If an informal settlement could not be reached, under those rules tenants were entitled to a written response within 10 working days. If the tenant requested a hearing, the hearing officer was instructed to schedule it "promptly" and render a decision within 10 working days. 1978 NCHA Rules § 2.124(c) & (5). The 1987 Rules tightened and shortened the time requirements mandating that the settlement conference be scheduled within 10 working days of the complaint and a decision rendered no more than 10 working days after the conference. 1987 NCHA Rules §§ 1102.2, 1102.3. Therefore, the District's *own* rules require the housing authority to respond to a tenant's complaint in a "prompt," expeditious fashion. Only a sophisticated magician could transform 353 days into a "prompt" response.

The District government offers no plausible explanation for failure to properly redress the grievance problem. Indeed, it appears that the most that was done to rectify a poor performance was to circulate "reminder" memoranda to property managers and other supervisory personnel importuning them to comply with the grievance procedures.[7] Beyond that, little, if anything, was undertaken. The government failed to adopt any measures or reforms designed to encourage and mandate compliance with federal and local requirements. There was little, if any, documentation as to training for grievance procedures.[8] The record does not reflect any reprimand of personnel for failure to follow relevant grievance rules.[9] Moreover, the District never monitored the grievance procedure to evaluate performance[10] and refused to ap-

---

vidual tenant's lease or PHA regulations which adversely affect the individual tenant's rights, duties, welfare or status.

6. The plaintiffs and the District agreed to the selection of 10 properties which were representative of the District's overall grievance procedure.

7. The first such memorandum was issued on July 28, 1982 by Sydney Glee. A second memo was circulated on October 24, 1983 after the commencement of this suit by Administrator Donald L. Harris. Plaintiffs' Statement of Facts, Exs. I & J (hereinafter cited as "Pl. Facts").

8. District officials conceded that they did not require mandatory training on the grievance procedure. The NAHRO certification training, the only mandatory training program required for all managers, does not include *any* component on the grievance procedure. The primary source of training constituted advice to read the 1976 & 1987 Rules. Harrison Dep. at 9, 10; Marshal Dep. at 26; Pl. Facts 58 & 59.

9. Officials could not recollect ever disciplining anyone for inadequately complying with the grievance procedure. Pl. Facts 57.

10. The District regularly monitors other aspects of the PMA's operations and compiles written reports. But despite its awareness of the delays and noncompliance with the grievance procedure, it never saw fit to adopt a monitoring system until 1987. Pl. Facts 55 & 56.

point additional hearing officers to handle the grievances.

The District's failure to adopt any effective reforms is disappointing to say the least in light of its own acknowledgment that delays were, in large part, a result of its failure to provide adequate training and to implement proper procedures. In response to the plaintiffs' interrogatory inquiring about the causes for excessive delays, Michael Williams, Chief of Management at PMA explained

In the 85 cases in which hearings took place in excess of six months after presentation of the grievance there are myriad factors which contributed to the delays. In some instances the grievant's request was inadvertently misplaced or lost. In some instances the grievance did not make it absolutely clear that their complaint was an administrative grievance for which a hearing was desired. *Another factor contributing to the delay was the relatively small amount of training concerning the implementation of the grievance procedure given to property managers. In some instances although the property managers involved adequately understood their responsibilities, they failed to follow the Rules and Regulations of the Agency.* This failure was undoubtedly premised in some instances upon the relative importance or priority placed upon grievance requests by such manages in relation to their other duties and responsibilities. (emphasis added)

Plaintiffs' Third Set of Interrogatories, 2d Supp.Ans. 3(k).

Plaintiffs are not alone in complaining about poor performances in the public housing management. Just this past year, the District of Columbia Auditor completed a review of the PMA's maintenance practices and concluded that the authority failed to operate an effective maintenance program and had only addressed 44 percent of the tenants' reported complaints.[11] The Auditor's Report directly corroborates plaintiffs' factual record and supports their claim that even after four years of litigation, together with internal and external pressure, the District has neglected and failed to redress the violations and comply with the federal requirements.

Defendants do not rebut plaintiffs' factual record demonstrating *past* noncompliance.[12] Rather, they rely on decisions from the D.C. Court of Appeals to support their argument that because the challenge is factual in nature, disposition at the summary judgment stage is disfavored and inappropriate. *McCoy v. Quadrangle Development Corp.*, 470 A.2d 1256 (D.C.1983).[13] However, as the Supreme Court stated only last term, the burden is on the opponent of a properly supported motion for summary judgment to come forward with evidence demonstrating the existence of a genuine dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If there is no "genuine" dispute over the "material" facts, then summary judgment is appropriate. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Defendants only dispute facts which relate to compliance with federal requirements in the *future*, claiming that recent 1987 regulations will remedy any past violations. Representations and assurances

---

**11.** District of Columbia Auditor, Review of the Department of Housing and Community Development's Property Management Administration Ch. VII, at 3 (Nov. 26, 1986) (hereinafter cited as "Auditor's Report").

**12.** Defendants' only substantive argument is completely specious. They contend that the property managers were not responsible for responding to complaints not filed on official forms (Defendants' Opposition at 10.) Nothing in the statute or regulations requires that grievances be filed on official forms. Further, such a requirement would be completely inconsistent with the statutory requirement that grievances can be advanced orally. Finally, even if one discounted those grievances not filed on official forms, the housing authority's record is still abysmal.

**13.** The ruling in this case, which is not binding on federal courts in any event, is questionable in view of recent Supreme Court decisions: *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) and *Liberty Lobby v. Anderson*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986).

concerning *future* plans and programs may be relevant to the determination of appropriate injunctive relief, but do not relate to the issue of liability for past and present noncompliance. Defendants do not dispute or challenge plaintiffs' factual record detailing a history of past violations. Under the circumstances, the Court must find that defendants have ignored and walked away from their responsibilities to public housing tenants. The oft-quoted adage: that justice delayed is justice denied appropriately sums up the consequences of the District's performance.

## II.

*Challenges to Specific Provisions of the District's Rules*

In the second prong of their motion for summary judgment, plaintiffs assert that several NCHA regulations are facially inconsistent with federal law. These challenges present purely legal questions properly resolved in a motion for summary judgment.

### A. The 10–Day Limitation for Filing Grievances

Plaintiffs challenge the rules which require that a complaint be submitted "not later than 10 working days after the Administration's act or failure to act which is the basis for the grievance." 1987 NCHA Rules § 1101.2; 1978 Rules § 12.2(4)(A). Essentially, the 10–day requirement acts as a statute of limitations. After the 10 days expire, the housing administration can rule that the complaint is untimely and disregard the tenant's demand to invoke the grievance procedure. Plaintiffs allege that the requirement is unworkable, inconsistent with federal regulations, and a violation of one's constitutional right to a *reasonable* amount of time within which to sue. This Court agrees.

The 10–day limitation is unworkable and unrealistic because of the difficulty in pinpointing *when* the District's failure to respond to an initial complaint—which is generally a tenant's request to repair an item such as a broken toilet—constitutes an "adverse action" triggering the limitation. The difficulty in isolating the date that the District's *failure* to complete a repair constitutes an "action" is exacerbated by the agency's demonstrated laxity in responding to complaints in the first place. A tenant's patience and tolerance go unrewarded. While a tenant believes he is affording the District a reasonable time to respond to a complaint, he may be in fact precluding himself from utilizing the grievance procedure.

The very justification for the 10–day limitation demonstrates why that rule is contrary to federal law. The District asserts that the tenants may resort to the judicial processes if they are shut out from the grievance procedure.[14] But, focus on the judicial forum highlights the adverse consequences of the 10–day limitation—continued reliance on the more costly, divisive, judicial process. Congress established a comprehensive grievance procedure to *discourage* recourse to the courts. Both this Court in its November 1986 memorandum and our Court of Appeals have stressed Congress's dual goals in adopting the grievance procedures to "avoid costly and divisive public housing litigation by channeling tenant-management disputes into a decentralized, informal and relatively nonadversarial administrative process." *See Samuels*, 770 F.2d 184, 189 (D.C.Cir.1985). *Samuels*, 650 F.Supp. 482 (D.D.C.1986). By adopting such a short limitations period which practically forces the tenant to resort to the judicial forum for relief, the grievance procedure is rendered a nullity. The short period directly undermines the explicit goals of the Congress for establishing the procedure.

The District does not respond to plaintiffs' substantive challenges that the 10–day limitation is inconsistent with federal law nor does it justify the need for such a short time restriction. It merely notes in a matter of fact fashion that plaintiffs had

---

**14.** Since any complaint relating to breach of the lease is subject to a three-year statute of limitations period, a tenant who fails to pursue her grievance within the requisite 10–day period can always seek relief in the courts.

an opportunity to object to the cutoff time in the "notice and comment" period which preceded promulgation of the new regulations and argues that failure to raise their objections at that time precludes plaintiffs from raising the claims at this point in the proceeding. Defendants however fail to supply any authority for their estoppel claim. They have good reason; it cannot be supported by authoritative case law. Under the District's theory, the only plaintiffs with standing to challenge the legitimacy of a particular agency rule, would be those who objected to the rule during the rulemaking process. The failure to object to a rule promulgated by a "state" agency during the notice and comment period does not constitute a waiver of one's right to bring a section 1983 action in federal court challenging the legality of a regulation. Such a waiver presents serious separation of powers issues and due process questions. It is well settled law that section 1983 does not require exhaustion of state administrative remedies *or* judicial remedies. *See Board of Regents v. Tomanio,* 446 U.S. 478, 491, 100 S.Ct. 1790, 1798, 64 L.Ed.2d 440 (1980); *District Properties Assoc. v. District of Columbia,* 743 F.2d 21, 27 (D.C.Cir.1984).

Additionally, the District's estoppel argument is based upon untenable, formalistic reasoning. While plaintiffs may not have lodged an official objection to the 10–day rule in the notice and comment period, the District clearly had notice of the plaintiffs' objections to the limitations. In fact, plaintiffs have objected to the limitation since the inception of this case in 1983.

By the 10–day rule, the District underscores its continued hostility to the grievance procedure and its determination to cut off-and deny ready access to the procedure. The only legitimate rationale for adoption of a limitations period is to prevent adjudication of stale claims. But a grievance does not become stale in 10 days. Memories and evidence of the effects of heat loss, lack of hot water, and broken toilets linger much longer than two weeks. Plaintiffs' suggestion of a one-year limitations period would afford tenants both a *fair* opportunity to utilize the grievance procedure and protect the District against combating stale claims.[15] Since the 10–day limitations provision frustrates a clear Congressional goal and is unworkable, it must be struck down.

### B. Inadequate Notice of the Grievance Procedure

■ Plaintiffs maintain that defendants fail to provide adequate notice of the grievance procedure. They argue that constitutional due process mandates that tenants receive specific notice of their right to a hearing *each* time they lodge a complaint. Plaintiffs allege that the tenants are not automatically provided notice of their grievance rights when they file a complaint.[16]

When the District receives a complaint it "handles" it in one of two ways. It either treats the complaint as an "official" grievance and utilizes the formal grievance procedure or regards the complaint as an unofficial "gripe" and processes it through an informal system.[17] When acting under its

---

15. The one-year period was not carved out of thin air. The parties had previously agreed to a one-year period in the proposed consent decree. *See supra* footnote 2.

16. The District contends that the tenants are currently informed about the grievance procedure in the following manners: notice of the procedure is attached to the District's answer after a tenant files an "official" complaint, a clause identifying the procedure is included in the tenant's lease; the grievance rules are posted and available at the manager's office, and the grievance procedure is periodically explained at tenant counsel meetings. Finally, the agency claims that it plans to mail a bulletin explaining the 1987 regulations.

Plaintiffs do not dispute that the tenants receive notice of the grievance procedure through these various mechanisms but they argue that these sporadic and general means of notice are insufficient to satisfy the notice requirements of the federal regulations the Constitution.

17. When acting under the gripe system, the Property Manager supposedly records each tenant's repair request on a Maintenance Work Order (PM–10). After completion of the repairs, the repair workers are instructed to include the nature of their work on the form and the property manager in turn signs the form and places it in the tenant's file.

The "gripe" system suffers from the same maladies as the grievance procedure. According to

informal "gripe" system, the District concedes that it routinely fails to inform the tenants about their grievance rights. Third Set of Interrogatories Answer 10(a–c) (filed June 23, 1986).

The District ostensibly utilizes its informal gripe system to resolve minor complaints. As such, it does not conflict *per se* with the dictates of the federal grievance procedure. However, defendants' failure to provide tenants with notice of their grievance rights when utilizing the "gripe" system constitutes a violation of the Housing Act, HUD regulations, and the NCHA's own rules and lease provisions. The relevant HUD provisions do not provide for a two-tiered notice requirement. The regulations require that each PHA provide a written answer to *any* oral or written grievance and "specify the procedures by which a hearing may be obtained." 24 C.F.R. 966.54. HUD regulations contemplate that *all* oral or written complaints which meet the statutory definition of a grievance, *see supra* note 5, would trigger the grievance procedure and accompanying notice requirement. These regulations were adopted in accordance with Congress's specific instruction to provide a comprehensive grievance procedure which would redress *all* tenant disputes. In the House report, accompanying the amendment to the Act, the committee wrote "the bill provides that the grievance procedures *shall be available* for *all* disputes between a PHA and an applicant, a tenant or a former tenant." H.R.Rep. No. 123, 98th Cong., 1st Sess. 35–36 (1983). (emphasis added) However, if the tenants are not aware of their rights to invoke the grievance procedure, the right is rendered meaningless for all practical purposes. Therefore, by refusing to afford the tenants notice under the "gripe" system, the District circumvents the requirements of the federal regulations and undermines Congress's goal to establish a comprehensive procedure.

Failure to provide tenants notice of their grievance rights each time they lodge a complaint also contravenes the agency's own contractual obligations and local grievance rules. Paragraph 15 of the standard Public Housing Lease mandates that the PHA give the tenant specific notice of her grievance rights when the administrator proposes adverse actions. Hence, each time the administrator refuses to provide the relief requested, he is under a contractual duty to advise the grievant of her rights. Additionally, the present 1987 rules require that a written notice be mailed to the tenant when a tenant's demand for repairs is denied; the notice must specify "the right of the complainant to a hearing." 1987 NCHA Rule § 1102.4(b).

The District contends that requiring the housing authority to provide specific notice of the grievance procedure imposes an onerous burden on the agency. But, the District can hardly object to a requirement which it has adopted itself. Arguments of administrative convenience are an insufficient basis for violating clear federal requirements. Defendants can no longer be permitted to ignore both federal mandate, local rules and their contractual obligations.[18]

Specific notice is essential to inform the tenants about the grievance procedure and afford them an actual opportunity to utilize the procedure. Federal law and the District's own rules require specific notice; so does this Court.

## C. Selection of Hearing Officers Contravenes HUD Regulations

■ Plaintiffs allege that the District has failed to select its hearing officers in accordance with federal law. HUD regulations provide two procedures to ensure the

---

the Auditor's Report, 56 percent of the tenants' grievances which were "responded" to under the informal procedure were never officially addressed. The Auditor concluded from the fact that 56 percent of the forms were never completed that either the repairs were never performed or the housing authority failed to comply with its own procedures. Auditor's Report at 12, 13.

18. Because the District's actual notice procedures contravene federal law and the lease provisions, the Court need not determine whether the provisions violate the constitutional standard for notice.

selection of an impartial, neutral hearing officer. Either the officer is selected on an ad hoc basis by the parties to the grievance or, if they cannot agree, each selects a panel member who in turn selects the hearing officer, 24 C.F.R. 966.55(b)(1). A second procedure permits the selection of the officer on a more permanent basis by "any method which is approved by the majority of tenants ... voting in an election or meeting of tenants held for that purpose." *Id.* 966.55(b)(2).

None of these procedures is relied upon. Currently, hearing officers are appointed by the PMA administrator with the concurrence of the NCHA Advisory Board. The Board is comprised of 53 elected tenants plus 15 mayoral appointees.[19] This selection process, however, has never been submitted to the tenants for approval. Indeed, when asked whether the hearing examiners were selected according to a process approved by the tenants, the District conceded that its 1987 plans were never submitted to the tenants. Plaintiffs' Third Set of Interrogatories Ans. 21(c). The failure to ratify the process in accordance with federal requirements constitutes a clear violation of HUD regulations. HUD does not promulgate regulations to be summarily ignored by local housing agencies. The entire process by which the District selects a hearing officer is a flagrant violation of federal requirements and is void. Until the District submits its selection process to a properly convened tenant meeting, it must appoint hearing officers according to the ad hoc selection system specified in 24 C.F.R. 966.55(b)(1).

## D. Administrative Review Process Violates Federal Law

■ The HUD regulations grant the NCHA the authority to review decisions of hearing officers, but provide for a limited scope of review. They provide that the hearing officer's decision "shall be binding on the PHA" unless the grievance does not concern a matter under the PHA's responsibility or the decision is contrary to the applicable laws.[20]

The District has incorporated the HUD regulations practically verbatim, but has included an additional basis for review in its 1987 regulations. The new rule permits the administrator to nullify a hearing officer's decision if determined that it is "not practicable or economical to implement and [the administrator] takes alternative action that is practicable and economical and directly addresses the complaint, consistent with Federal and D.C. law and regulations." NCHA Rule § 1113.1(c). Plaintiffs argue that this additional basis for review exceeds the expressly *limited* review basis, specified in the federal regulations and therefore must be struck down. The Court agrees. The HUD regulations concerning administrative review are clearly and narrowly written. They provide that a decision by a hearing officer *"shall"* be binding unless the relief goes beyond the jurisdiction of the housing authority or is contrary to law. The strict limitations on the PHA's review powers are intentional. These limitations further Congress's goal to create an informal, *comprehensive*

---

**19.** Originally the Mayor only had 10 slots on the Advisory Board, but later, the number was expanded to 15. Plaintiffs argue that the presence of Mayoral appointees on the Board dilutes the power of the tenants and undermines the goal of selecting a neutral, objective officer. Plaintiffs also argue that federal regulations were conceived so that the tenants would have at least an equal say in the selection of hearing officers. Under the current system the District officials both appoint and participate in the ratification of the officer; their presence on both sides of the process undermines the goal of equal participation. However, since the entire process is void, the Court need not resolve whether the District's plan is in accordance with the spirit of the HUD regulations.

**20.** The HUD regulations provide in full that the decision of the hearing officer "shall be binding on the PHA ... unless" the PHA makes a determination that:

(1) The grievance does not concern PHA action or failure to act in accordance with or involving the complainant's lease or PHA regulations, which adversely affect the complainant's rights, duties, welfare or status;

(2) The decision of the hearing officer or hearing panel is contrary to applicable Federal, State, or local law, HUD regulations or requirements of the annual contributions contract between HUD and the PHA.

24 C.F.R. 966.58(b).

grievance procedure guided by an impartial, objective and neutral hearing officer who is empowered to resolve tenants' disputes quickly and fairly.

The creation of a grievance procedure was intended to *avoid* tenant-management conflict. The 1987 rule undermines Congress's goal by empowering the housing administrator to overrule the decision of a hearing officer on the grounds that it is "impractical" or "uneconomical." But the District has failed to define these extremely broad terms. Their very vagueness provides the housing administrator unfettered discretion to veto the hearing officer's decision. Hence, rather than preventing the festering of hostilities between tenants and management, the new rule casts management back onto the center stage of the conflict.

Defendants offer no valid reason for reading HUD's narrowly written regulation to permit a third basis for administrative review. The District rests its defense of the additional provision on policy grounds, arguing that the expanded scope of review is necessary to protect the long range planning efforts of the PMA.[21] However, the District's policy arguments must fall in the face of a clearly and narrowly written reg-

ulation. If HUD were concerned that the decisions of the hearing officers might jeopardize long term development plans of the housing authority, it could have accorded the local authorities greater powers of review. But HUD did not. Therefore, the District cannot be permitted to arrogate to itself inflated review powers particularly when they frustrate federal goals.

## III.

### A. The Appropriate Relief

■ Plaintiffs seek specific declaratory and injunctive relief including an order striking down those provisions inconsistent with the federal regulations and an order directing the District to implement and operate a grievance procedure which complies with federal guidelines. They also request that the Court impose a monitoring system for a sufficient period to ensure defendants' compliance. The District has countered and has moved the Court for a stay of hand, contending that the NCHA is attempting to rectify the problems of the existing grievance system and should be given an opportunity to operate under the newly promulgated regulations.[22]

*After years of unfulfilled promises to remedy the system,[23] followed by repeated*

---

**21.** The District advanced these same arguments in an earlier motion where they contended that the HUD regulations did not empower the hearing officer to award equitable relief. The Court rejected this argument then and rejects it now. *See Samuels,* 650 F.Supp. 482 (D.D.C.1986). The District cannot attempt to undermine the powers of the hearing officer to award equitable relief through an expansion of its administrative review powers.

**22.** In its reply brief, the District advanced a wholly new argument in support of its Motion to Stay. It argued that HUD has proposed new rules to govern the grievance procedure which would moot many of plaintiff's objections. 51 Fed.Reg. 26514 (July 23, 1986). In the interests of judicial economy, the District argues, the Court should stay its hand until after HUD adopts these regulations.

The District's new argument is both irrelevant and lacks merit. It is irrelevant because the Court's duty is to apply the law as it exists today, not how it might exist sometime in the unknown future. *See Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). If the District's motion were granted, plaintiffs's rights to invoke the

grievance procedure would be in limbo until HUD made a decision whether to adopt the proposed rules. It lacks merit because the Court has no basis for knowing *when* or *whether* HUD will actually adopt these proposed regulations. The District's assertion that adoption is *forthcoming is completely speculative.*

**23.** In the earlier stages of this proceeding, the District filed a motion to dismiss arguing that the plaintiffs' complaint was moot because "defendants are taking affirmative steps to ensure that such delays are not repeated in subsequent grievance cases." Defendants' Motion to Dismiss at 4 (filed Oct. 27, 1983). Yet as plaintiffs have proven, no reforms were instituted and delays continued.

Again, in March, 1986, defendants opposed the plaintiffs' motion for class certification based on their promises that "defendants are attempting to improve their grievance procedure." Def. Supplemental Opposition to Plaintiffs' Motion for Class Certification. Yet again, no reforms were instituted. The District's record in failing to fulfill past promises offers little confidence that the District will meet its current pledges.

delays and promises, and without any tangible indications of accomplishments, the Court refuses to stay its hand based on yet *more* promises of future reforms. First, the District has not proposed any reforms which would correct the illegal provisions included in its 1987 rules. As explained above, these provisions demonstrate the District's continuing efforts to block access to the grievance procedure through unreasonably short limitations periods and inadequate notice, and its efforts to divest control from supposedly independent hearing officers through the selection system and the broad scope of administrative review. The decision to incorporate these provisions in its 1987 rules after being on notice for several years of the plaintiffs' challenges, confirms the District's hostility to an independent, effective grievance process and undermines any claims that it has a long term commitment towards remedying the procedure.

Further, each of the proposed "reforms" made on the eve of trial have yet to be instituted. The District's recent proposals to establish an independent office of fair housing, to expand training programs on the operation of the grievance procedures and to implement a computer system which will track the status of all grievances are praiseworthy as a first step towards preventing a continuation of their past abysmal performance. But "promises of reform" offer no basis for withholding injunctive relief. Other courts considering eleventh hour reforms have imposed a heavy burden on the defendants to show that there will be no recurrence of the violations before even considering whether to defer injunctive relief. *Campbell v. McGruder*, 580 F.2d 521, 540 (D.C.Cir.1978) (court upheld order for injunctive relief to improve jail conditions concluding that the District's occasional and sporadic efforts to upgrade the facilities during the five-year pendency of the litigation did not constitute

the necessary commitment to long range continuing effort in compliance); *NAACP v. City of Evergreen, Alabama*, 693 F.2d 1367, 1370 (11th Cir.1982) (where there is "abundant evidence of consistent past discrimination, injunctive relief is *mandatory* absent clear and convincing proof that there is no reasonable probability of further noncompliance with the law"). Given the District's record of recalcitrance and its stubborn refusal to bring its rules into compliance with federal law, the Court refuses to stay its hand based on future promises.

After continually assuring the Court that it was improving its grievance procedure, the District has still failed to provide hearings in a timely fashion.[24] One would think that at least while the Court has these motions under advisement, the defendants would institute a model program and attempt to respond to grievances in a timely fashion. Their continued failure to implement a functional system consonant with federal law demonstrates the stark insincerity of their promises that they are combating the core problems besieging the grievance procedure. The District's intractable resistance to reform confirms the low probability of compliance with federal requirements, absent court intervention.

Accordingly, summary judgment is entered for the plaintiffs. The defendants' motion to stay proceedings is denied.

An appropriate order will be entered.

---

**24.** Counsel for a public housing tenant attested that his client had requested a hearing on May 23, 1986. Despite numerous letters and telephone calls to the housing administrator, the tenant has still failed to obtain a hearing. Affidavit of Daryl Dodson (filed July 8, 1987).